**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

GARY C. AUTRY, SR.

        Plaintiff,

vs.                                                       Case No. 3:04-cv-723-J-32TEM

NASSAU COUNTY SCHOOL BOARD,

        Defendant.

_____

**ORDER**[1]

      This case is before the Court on Defendant Nassau County School Board's Dispositive Motion for Summary Judgment and Memorandum of Law in Support (Doc. 18).  Plaintiff Gary C. Autry, Sr. filed a response.  (Doc. 25).  The Court heard oral argument on March 10, 2006.

**I.    BACKGROUND**

      This is a race discrimination case brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*  Plaintiff, an African-American, pleads four counts in the Amended Complaint (Doc. 11) as follows: (1) Count I - defendant discriminated against plaintiff based on his race when it failed to select him in February 2003 to serve as the head varsity football coach at Fernandina Beach

_____

    [1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

High School (FBHS); (2) Count II - the method in which defendant hired head football coaches throughout the sixteen year period plaintiff applied for the position at FBHS had a "discriminatory effect" (disparate impact) on plaintiff; (3) Count III - defendant retaliated against plaintiff when it failed to hire him as head football coach at FBHS in May 2004 because he had previously filed a charge of discrimination on August 4, 2003; and (4) Count IV - defendant discriminated against plaintiff based on his race when it selected another African-American to serve as head football coach at FBHS in May 2004.  (Id. at ¶¶ 28, 33-53).

### A.    Plaintiff's Background

Plaintiff has been employed as a teacher with the Nassau County School Board ("School Board") for over twenty years.  (Doc. 20-2, Pl. 9/8/05 Dep. at p. 6).  He began his employment in 1981, left briefly, before returning to Nassau County, where he has been employed as a social studies teacher since.  (Id. at p. 9-10).  Plaintiff's first position with the School Board was at Yulee Junior High School in 1981, where he served as a substitute, and then a full time social studies teacher after receiving his teaching certificate.  (Id. at pp. 9-10, 19-20).  While at Yulee Junior High plaintiff was an assistant football coach for two years and the head football coach for three years.  (Doc. 20-3, Pl. 9/8/05 Dep. at p. 25).  During his first year as head football coach, the team compiled a record of zero wins and six losses.  (Id. at p. 26).  During his second and third seasons, respectively, the team finished with three wins and two losses, and six wins and one loss.  (Id.).

After teaching for six years at Yulee, plaintiff worked for the Duval County School Board as a teacher at Ed White High School for one year.  (Id.).   While at Ed White, plaintiff served as an assistant football coach and head wrestling coach.  (Id.).  After that year, plaintiff returned to Nassau County as a social studies teacher at FBHS, where he still serves.  (Doc. 20-2, Pl. 9/8/05 Dep. at pp. 9-10).  Throughout his tenure at FBHS, plaintiff has served as an assistant football coach for eleven seasons under four different head coaches.  (See generally Docs. 20 & 21, Pl. 9/8.05 and 10/11/05 Deps.; see also Doc. 19-7, Ex. "6" - plaintiff's resume).

**B.     History of the Head Football Coaching Position at FBHS**

Plaintiff has applied for the head football coach position at FBHS seven times since 1988 and has never been selected.  In 1988, plaintiff applied for the position vacated by Coach Joel Stockstill, a white male, but then Principal Dr. William Fryar ultimately reappointed Coach Stockstill after the top two candidates declined the position.  (Doc. 21-4, Pl. 10/11/05 Dep. at pp. 65-67).  To make this hiring decision, Principal Fryar empaneled a search committee, on which Coach Stockstill served as a member.  (Doc. 21-4, Pl. 10/11/05 Dep. at p. 67).

In or about 1992, Coach Stockstill vacated the position and plaintiff applied.  (Doc. 20-3, Pl. 9/8/05 Dep. at p. 33).  Principal Fryar, without the use of a hiring committee, hired Mike Emanuel, a white male who at the time was an assistant football coach (defensive coordinator) at FBHS.  (Id.)  Plaintiff served on Coach

Emmanuel's staff as an assistant coach for "several" months, but stepped down because Coach Emmanuel "was unable to establish a slate of assistant coaches." (Id. at pp. 34-35).

In 1993, Coach Emmanuel resigned and Principal Fryar empaneled another search committee to hire a football coach. (Doc. 21-2, Pl. 10/11/05 Dep. at p. 5). Plaintiff applied for the position, but it was awarded to Larry Milligan, a white male. (Doc. 20-3, Pl. 9/8/05 Dep. at p. 36). Before accepting the position, Coach Milligan served as the head football coach at Madison County High School in Danielsville, Georgia from 1988 through February 1994. (Doc. 28-2, Milligan Decl., ¶ E). Coach Milligan was the head football coach at FBHS for two years, and ultimately resigned in the spring of 1996. (Id. at ¶ K). In the fall of 1995, Coach Milligan's second season as football coach, plaintiff served as an assistant coach, and the team compiled a record of eight wins, one loss and one tie. (Doc. 20-3, Pl. 9/8/05 Dep. at pp. 44-45).

After Coach Milligan resigned in the spring of 1996, plaintiff again applied for the head football coach position, but was not selected. (Id. at pp. 47). Then Principal Dr. Michael Dean recommended that the School Board hire Greg Purdham, a white male who had been coaching at the college level (Missouri College). (Id. at pp. 47-49; Doc. 21-2, Pl. 10/11/05 Dep. at p. 5). Coach Purdham served as the football coach for two seasons; plaintiff served as an assistant during both. (Doc. 20-4, Pl. 9/8/05 Dep. at p. 51). During Coach Purdham's tenure, the team had two losing seasons. (Id. at pp. 51-52).

After Coach Purdham resigned, plaintiff again applied for the position, but Principal Dean hired Bob Howard as the head football coach; Coach Howard's tenure began in the 1997-1998 school year. (Id. at p. 53). When Coach Howard was hired, he was serving as an assistant coach on Coach Purdham's staff along with plaintiff. (Id. at pp. 53-55). During Coach Howard's five years as the football coach, plaintiff served as an assistant on his staff. (Id. at p. 55). Coach Howard was asked to resign after the 2002 season; however, Coach Howard maintained his teaching position at FBHS. (Id. at p. 60; Doc. 19-3, Arnold Dep. at pp. 46-47).

### C.   Spring 2002 Party - Ken Roland Remark

In the spring of 2002, Mike Sinor, an assistant varsity football coach under Coach Howard, attended a going away party for the head boys basketball coach, Lou Perera. (Doc. 26-4, Sinor Decl., ¶ F). During the party, Coach Sinor spoke with Athletic Director Ken Roland about ways of getting more African-American students to play sports at FBHS. (Id. at ¶ I). According to Coach Sinor, Roland responded, "they (African Americans) are not going to play for you, blacks are lazy."[2] (Id.).

---

[2]   Coach Sinor states that when he left his head football coaching position at Wolfson High School in 2001 to assist on Bob Howard's staff at FBHS, Ken Roland and Principal Arnold agreed that if he served as an assistant coach under Bob Howard for two years, he would then become head football coach at FBHS. (Doc. 26-4, Sinor Decl., ¶¶ D & E). During the spring 2002 party, Coach Sinor also overheard Athletic Director Ken Roland tell Coach Perera that "I'm going to get him (Bill Foreman) here at Fernandina Beach High School (to be the head varsity football coach)." (Id. at ¶ F).

### D.    Hiring of Coach Bill Foreman in 2003

In January 2003, the School Board posted a vacancy for an "In School Suspension" (ISS) instructional position. (Doc. 18-4).  The vacancy announcement noted that the successful applicant must also have the "[a]bility and willingness to assume the position of Head Varsity Football Coach."[3]  (Id.).  Because Principal Jane Arnold intended that the person hired for the ISS position would also serve as the head varsity football coach, the focus was on finding the right candidate to serve as the football coach.  (Doc. 21-2, Ex. "A" Association Contract, Article X(B)(4)).[4]  In hiring for full-time and supplemental positions, the Principal selects a candidate and recommends that candidate to the Superintendent, who, in turn, makes a hiring recommendation to the School Board; the School Board either accepts or rejects the candidate for good cause.  See Fla. Stat. §§ 1012.22, 1012.27, 1012.28.

The hiring of the head football coach at FBHS in 2003 serves as the basis for plaintiff's claims in Counts I and II in the Amended Complaint.  (Doc. 11, ¶¶ 33-43). While Principal Arnold was charged with making the recommendation to Superintendent John Ruis as to who should ultimately be hired as football coach, she empaneled a committee to assist her in making the decision.  (Doc. 19-3, Arnold Dep.

---

[3]    To serve in a supplemental position, such as the head football coach, an individual must be a full time employee of the School Board.  (Doc. 19-3, Arnold Dep. at p. 26).

[4]    This citation refers to the 2002-2005 Agreement between The Nassau County School Board and The Nassau Teachers' Association (the "Association Contract").

at pp. 45, 51-52).  The committee was composed of: Principal Jane Arnold (Chair), Scott Hodges (Assistant Principal and Co-Chair), Ken Roland (Athletic Director and Head Baseball Coach), Joel Stockstill (Guidance Counselor and past Head Football Coach), Larry Coleman (School Advisory Committee and FBHS Foundation member), Tarris Dallas (Community Youth Programs), Larry Coleman (School Advisory Committee and FBHS Foundation Member), Phil English (President of the Quarterback Club), and Jim Welborn (Quarterback Club Member). (Doc. 19-7, Arnold Dep., Ex. "4").  Of the committee members, Messrs. Dallas and Coleman are African-American; the rest are white.

To facilitate the process, Principal Arnold prepared an interview summary sheet using a point system to evaluate applicants.  (Id. at Ex. "5").  Principal Arnold prepared the interview summary sheet to focus the committee on issues she deemed important to the football program; it was meant, in essence, as an organizational tool to gather similar information from each of the ten applicants. (Doc. 19-4, Arnold Dep. at p. 54).  While Principal Arnold testified that she did not intend for the interview summary sheets and the point totals combined for each applicant to be dispositive in who was selected (Id.), at least one committee member, Larry Coleman, testified that the total points for the applicants were tabulated and that the recommendations were based upon that tabulation.   (Doc. 22-2, Coleman Dep. at pp. 20-23).  Principal Arnold also informed the committee that she was looking for a candidate who could make a long term commitment as the FBHS coach.  (Doc. 19-5, Arnold Dep. at p. 75).

The committee interviewed Bill Cubit, Bill Foreman, Ed Brown, Gary Autry (plaintiff), Fred Culver, Donald Shannon, Brian Schuster, Mike Sinor, Charles Weems, and John Hill.  (Doc. 23-5, Dallas Dep., Ex. "1").  The interviews were conducted on consecutive days in January 2003.  (Doc. 19-5, Arnold Dep. at p. 79).  At the conclusion of the interviewing process, the committee reached a consensus on the top two choices:  Bill Cubit and Bill Foreman, respectively, both of whom are white. (Doc. 19-5, Arnold Dep. at pp. 81-82).

The ISS teaching position and supplemental football coach position were offered to Bill Cubit, who declined.  (Doc. 19-5, p. 92).  Principal Arnold then recommended Bill Foreman to Superintendent Ruis, who, in turn, recommended Coach Foreman to the School Board.  (Doc. 19-9; Ex. "G," Superintendent's Recommendation Regarding Personnel).  The School Board approved the recommendation, and Bill Foreman was hired to fill the ISS position being vacated by Ms. Jimmye Owens-Williams, and to serve as the head varsity football coach.[5]

_____

[5]     The ISS position was being vacated by Ms. Jimmye Owens-Williams, who had entered into the Deferred Retirement Option Program (DROP) in August 1998.  Thus, the School Board had been aware since August 1998 that Ms. Owens-Williams was retiring effective July 31, 2003.  (Doc. 18-10, Ex. "H," Ms. Owens' Florida Retirement System and DROP notification).  Ms. Owens-Williams asserts in her declaration submitted with plaintiff's opposition to defendant's motion for summary judgment that after signing the initial DROP documentation in 1998, she became aware that the Florida legislature changed the law and that she could serve an additional three years through the 2005-2006 school year.  (Doc. 26-7, Ex. "6" at ¶ E, Decl. of Jimmye Owens-Williams). Ms. Owens-Williams, however, notes that she never informed the School Board of any intention she had to continue working past her original DROP date.  (Id. at ¶¶ E & F).  Ultimately, on April 24, 2003, Ms. Owens-Williams submitted her

Because there was no position available until July 31, 2003, FBHS had to obtain clearance from the School Board that Coach Foreman could serve as an athletic volunteer so that he could coach FBHS during spring practice beginning in April 2003. (Doc. 18-10, Exs. I & J).  When the school year began, however, Foreman ultimately filled the position of Dean of Attendance.  (Doc. 19-6, Arnold Dep. at p. 114).

Coach Foreman served as the head football coach during the 2003 football season, but tendered his resignation on May 11, 2004 via letter to Principal Arnold. (Doc. 18-13, Ex. "K").  He resigned during spring practice.  (Doc. 19-6, Arnold Dep. at p. 109).

After the School Board hired Coach Foreman, plaintiff spoke with Principal Arnold and expressed his displeasure as to the hiring process; specifically, that he did not think it was fair and that he was going to take some action in protest.  (Doc. 19-4, Arnold Dep. 66).  Thereafter, plaintiff protested the selection of Coach Foreman at a School Board meeting, (id.), and wrote a letter expressing his position to the members of the School Board (Doc.19-7, Arnold Dep. Ex. "5").  In addition, there were news

_____

letter of resignation to Superintendent Ruis stating it was effective on July 15, 2003.  (Id. at ¶ M).  This is relevant because of plaintiff's argument in his opposition and during oral argument that there was no open position at the precise time Principal Arnold recommended Coach Foreman for the position in 2003 because Ms. Owens-Williams had not yet vacated the ISS position. Defendant argues that because Ms. Owens-Williams' contract for the school year expired on July 31, 2003, it had a reasonable expectation that she would not return based on her participation in the five year DROP beginning in 1998 and that she never informed the School Board thereafter that she was not retiring.

stories aired and printed concerning plaintiff's discontent with the Foreman hiring. (Doc. 19-4, Arnold Dep. at p. 66).   On August 4, 2003, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") claiming that the School Board discriminated against him based on his race when it hired Bill Foreman.  (Doc. 11, ¶ 28; Doc. 21-2, Pl. 10/11/05 Dep. at p. 24).

### E.    Hiring of Coach Ed Brown in 2004

After Coach Foreman resigned in May 2004, Principal Arnold did not reconvene the selection committee.  (Doc. 19-6, Arnold Dep. at p. 107).   In making her hiring recommendation, she considered: (1) the qualifications of the remaining applicant pool that had been considered in 2003; (2) the short time frame in which a decision had to be made; and (3) the instructional positions available at the high school for the following school year.  (Doc. 19-6, Arnold Dep. at p. 108).

When the head football coaching position came open in May 2004, Principal Arnold knew that FBHS would have an open position in the math department for the 2004-2005 school year.  (Id. at pp. 108-110).   Principal Arnold recommended Ed Brown, an African-American, to fill a position in the math department the following school year and to coach the varsity football team.  (Id. at p. 114).[6]   At the time, Coach Brown served as a math teacher at Fernandina Beach Middle School (FBMS)

_____

[6]    Plaintiff contends, however, there was no "vacancy" in the math department (as defined by the 2002-2005 Nassau Teachers' Association Agreement) at the precise time the School Board offered the position to Ed Brown.  (Doc. 18-2, p. 16, Article X, ¶ A).

and coached the football team there; he had held those positions since 1993.  (Id.; Doc. 19-8, Ex. "8").  During his tenure as FBMS head football coach, Coach Brown compiled a record of 51 wins, 20 losses, and 1 tie, with undefeated seasons in 1997 and 1998, and conference championships in each of those years and in 2002.  (Id.). Coach Brown had no varsity head football coaching experience.  (Id.).  After this hiring, plaintiff filed a charge of discrimination with the EEOC alleging that the School Board retaliated against him when it failed to hire him in 2004.  (Doc. 21-2, Pl. 10/11/05 Dep. at p. 24).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute."  Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986).  In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor.  Centurion Air Cargo, Inc. v. United Parcel

Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005).

## III.   DISCUSSION

### A.   Race Discrimination Claims (Counts I and IV)

#### 1.   Applicable Legal Framework

A plaintiff must establish a prima facie case using direct evidence of discrimination or by relying on circumstantial evidence to prove discriminatory intent. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004). To establish a prima facie case using direct evidence, a plaintiff must present "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption; in other words, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate ... constitute direct evidence." Id. This is not a direct evidence case, thus plaintiff must establish a prima facie case pursuant to McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), using circumstantial evidence.

In McDonnell-Douglas, the Supreme Court set forth the applicable legal framework for assessing circumstantial evidence discrimination claims. Plaintiff is required to establish a prima facie case of discrimination by showing that: (1) he belongs to a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified for the job. McDonnell-Douglas Corp., 411 U.S. at 802; Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts

adequate to permit an inference of discrimination." Holifield, 115 F.3d at 1562.

If plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for the employment action, which is clear, reasonably specific and worthy of credence. Hall v. Alabama Ass'n of Sch. Bds., 326 F.3d 1157, 1166 (11th Cir. 2003). At this stage, the defendant has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. Id. (citing McDonnell-Douglas, 411 U.S. at 802). The Eleventh Circuit has described this burden on the defendant as "exceedingly light." Batey v. Stone, 24 F.3d 1330, 1334 (11th Cir. 1994) (citations omitted).

Once the employer satisfies its burden, the presumption against the defendant is rebutted, and plaintiff must show that the defendant's proffered reason is merely pretext for an illegal motive. McDonnell-Douglas, 411 U.S. at 802-04; Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002). At this phase, the plaintiff must "introduce significantly probative evidence showing the asserted reason is merely pretext for discrimination." Sheppard v. Sears, Roebuck & Co., 391 F. Supp. 2d 1168, 1180 (S.D. Fla. 2005) (quoting Zaben v. Air Prods. & Chems., Inc., 129 F.3d 1453, 1457 (11th Cir. 1997)). The plaintiff cannot establish pretext merely by questioning the wisdom of the employer's reasons, at least not where the reason is one that might motivate a reasonable employer. Alexander v. Fulton Cty., 207 F.3d 1303, 1339 (11th Cir. 2000) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir.

1997)); <u>Damon v. Fleming Supermarkets of Florida, Inc.</u>, 196 F.3d 1354, 1361 (11th Cir. 1999) (courts "are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision").

A plaintiff may establish pretext in different ways.  He may either directly persuade the Court that a discriminatory reason more likely than not motivated the employer or may demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." <u>Jackson v. State of Ala. State Tenure Com'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005).  Further, one of the indirect ways to show pretext is by illustrating that there was a deviation from a policy in making an employment decision, especially when rules are bent or broken to give a non-minority applicant an advantage.  <u>Carter v. Three Springs Residential Treatment</u>, 132 F.3d 635, 644 (11th Cir. 1998).  However, standing alone, a deviation from company policy does not establish discriminatory animus.  <u>Mitchell v. USBI Co.</u>, 186 F.3d 1352, 1355-56 (11th Cir. 1999).

### 2. 2003 Hiring of Bill Foreman

#### a. Plaintiff's prima facie case of race discrimination

Defendant contends that plaintiff fails to establish a prima facie case based on the 2003 hiring of Bill Foreman because there was no adverse employment action. Defendant contends that the head football coach position was merely supplemental

and did not otherwise affect plaintiff's compensation and benefits as a teacher with the School Board; thus, the decision not to hire plaintiff did not materially affect his conditions of employment.  Plaintiff contends that he has satisfied all of the required elements of a prima facie case of discrimination.

"An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of opportunities, or adversely affects his or her status as an employee." Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) (citation and quotation omitted).  An action, however, which fails to seriously and materially affect an employee's employment is not an adverse action.  Id. The question of whether an employee has suffered a materially adverse employment action will normally depend on the facts of each individual case.  Id.

While the FBHS head football coach position is not a separate position for which the School Board hires, it is nevertheless a supplemental position filled by a School Board employee who receives additional pay to perform the job.  (Doc. 19-3, Arnold Dep. at p. 44).  Merely because plaintiff was already employed as a history teacher at FBHS, it does not follow that there was no adverse employment action when he was not hired as head football coach.  Indeed, the failure to hire a full time teacher into a supplemental position such as head football coach affects that teacher's compensation, terms, conditions or privileges of employment; moreover, the

position of head varsity football coach not only carries with it extra pay, but also prestige in the community.  See Gupta, 212 F.3d at 587; see also Fuhr v. School Dist. of City of Hazel Park, 131 F. Supp. 2d 947, 952 (E.D. Mich. 2001) (failure to promote female, who was the head girls varsity basketball and junior varsity boys basketball coach, to the position of head varsity boys basketball coach constituted an adverse employment action as the position sought was clearly a promotion with higher visibility, a more distinguished title, and higher pay).

Therefore, plaintiff suffered an adverse employment action when he was not hired into the supplemental position of head varsity football coach in 2003.  Defendant does not raise any additional arguments as to whether plaintiff fails to establish a prima facie case of race discrimination for the 2003 hiring.  The burden shifts to defendant to articulate a legitimate non-discriminatory reason for the decision to hire Bill Foreman, instead of plaintiff.

### b.    Defendant's non-discriminatory reason

Defendant posits Principal Arnold, with the aid of the advisory committee, chose the best candidate in 2003 for the head football coach position.  Of the ten candidates interviewed, the committee came to a consensus on the top two (Bill Cubit and Bill Foreman) and recommended them in that order to Principal Arnold.  While committee member Tarris Dallas (African-American) thought plaintiff met the qualifications to serve as head football coach (Doc. 23-3, Dallas Dep. at p. 33), he testified:

Q:      ... After all the interviews, was there a discussion among the committee members to come to a consensus as to who would be

-16-

the first choice to receive the offer?

A:    Yes.

Q:    And can you tell me how this discussion came about, who moderated the discussion?  Just give me an idea of what occurred.

A:    Well, Bill Cubit was the obvious choice, you know, after all the interviews that I sat in on.  Bill Cubit was overwhelmingly the committee's preference.

Q:    And can you tell us why?

A:    Based on his experience, the gentleman - - you know, he was currently at that point the offensive coordinator at Rutgers University.  It was just a no brainer, at least from my standpoint, and I'm almost certain that this is the perception that everyone else had.  The guy was - - look at his resume.  How can you not offer it to him?

\*   \*   \*

Q:    In coming to a decision that Bill Forman would be the second choice, was there discussions and then a vote among the committee members?  Can you tell me how that occurred?

A:    We voted that Bill Forman, as a committee, would be the second choice.

\*   \*   \*

Q:    In your opinion, Mr. Autry was not your top recommendation to fill the position of varsity head football coach; is that correct?

A:    That's correct.

Q:    It was not the recommendation of the committee that Mr. Autry fill the position of varsity head football coach; is that correct?

A:    That's correct.

-17-

Q:      It is your opinion that Mr. Autry was not the most qualified candidate for the position; is that correct?

A:      Yes, that is my opinion.

*      *      *

Q:      It's your opinion that Mr. Forman was a better candidate for the position than Mr. Autry; is that correct?

A:      Yes, based on his interview, strictly based on his interview.

(Docs. 23-3, 23-4, Dallas Dep. at pp. 33, 37-38, 66-68).

Larry Coleman, another African-American member of the committee, who is also plaintiff's cousin, likewise testified that the committee came to a consensus on the top two candidates (Bill Cubit and Bill Foreman):

Q:      Did you agree with the committee's recommendation not to recommend Gary Autry for the head coach position?

A:      Yes.  As I sit on that committee, that was not what I was there to do.  I was there to make a recommendation of who, in that process, was probably the best person to recommend.  I was not there to not recommend a person.

Q:      Is it your understanding that the head coach position was eventually offered to Bill Forman?

A:      Yes.

*      *      *

Q:      Did you agree with the recommendation that the committee made to the principal, in terms of the first - - in terms of the top two or three recommendations for head football coach?

A:      Yes.  It was a consensus of the group, yes.

Q:      And you were in agreement with that consensus?

-18-

A:     Yes.

(Doc. 22-3, Coleman Dep. at pp. 33, 38).

While Principal Arnold was not bound by the committee's recommendation, she followed it and offered the position to Bill Cubit, who declined, then to Bill Foreman, who accepted.  (Doc. 19-5, Arnold Dep. at pp. 92-93).  Thus, while defendant notes that plaintiff was qualified for the job, the undisputed legitimate non-discriminatory reason for not hiring him is that the "best" candidates were chosen from the ten finalists.  The presumption of discrimination disappears, and plaintiff bears the burden to adduce sufficient evidence that defendant's proffered reason is pretext for an illegal motive.  McDonnell-Douglas, 411 U.S. at 802-04; Rojas, 285 F.3d at 1342.

### c.     Plaintiff's evidence of pretext

Plaintiff contends that: (1) he was qualified for the position; (2) the comment made by Ken Roland to Coach Perera during the spring 2002 party is circumstantial evidence of discriminatory animus imputed to defendant; (3) defendant has changed the manner in which it hired a head football coach at FBHS throughout the sixteen year history plaintiff has applied for the position to systematically deny him an opportunity (and that this culminated with the hiring of Bill Foreman in 2003 and Ed Brown in 2004); (4) defendant has "changed" the qualifications for the head football coach position at FBHS over the sixteen year period that plaintiff applied for it; and (5) the School Board improperly hired Coach Foreman because there was no vacancy at FBHS as defined by the 2002-2005 Agreement between the School Board and the

-19-

Nassau Teachers' Association ("Association Contract").   Defendant contends that plaintiff has elicited no evidence of pretext to rebut the legitimate non-discriminatory reason that Bill Foreman was the best applicant (after Bill Cubit) for the position in 2003.

### i.      Relative qualifications

Instead of focusing on the proffered non-discriminatory reason the School Board articulates, plaintiff sets forth a detailed history of how many times he has applied for the position and the resulting decision to hire someone else on each occasion.   While plaintiff is correct that historical or statistical information concerning hiring for a position is relevant to showing pretext, the ultimate inquiry remains whether the School Board intentionally discriminated in failing to hire plaintiff in 2003. See Brown v. American Honda Motor Co., Inc., 939 F.2d 946, 952 (11th Cir. 1991) (citations omitted).   Simply establishing that since 1988 the School Board had not hired a black head football coach at FBHS (until 2004), and has not hired plaintiff on each occasion that he applied, does not amount to evidence of pretext.   Plaintiff must also show that the reason given for hiring Bill Foreman in 2003, i.e. that he was the best candidate after Bill Cubit, was false, and that the decision was instead racially motivated.

Plaintiff does not detail whether Bill Foreman was either unqualified for the job, or that plaintiff was more qualified.   Instead, plaintiff baldly asserts that the facts of the case support that the decision to hire Bill Foreman was race based.   The Eleventh

Circuit has noted that to proffer sufficient evidence of pretext in a failure to hire case based on disparities in qualifications, plaintiff must show that the "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Cooper v. Southern Co., 390 F.3d 695, 732 (11th Cir. 2004) criticized by Ash v. Tyson Foods, Inc., 126 S.Ct. 1195, 1197 (Feb. 21, 2006);[7] see also Raad v. Fairbanks North Star Borough Sch. Dist., 323 F.3d 1185, 1194 (9th Cir. 2003) (qualifications evidence standing alone may establish pretext where the plaintiff's qualifications are "clearly superior" to those of the selected applicant).

Here, whatever the required showing following Ash, plaintiff cannot make it. While plaintiff served as the head football coach at Yulee Middle School for three years with great success and as an assistant coach at FBHS for eleven years under four different head coaches, he cannot show that he was better qualified than Bill

---

[7]    In Ash, the Supreme Court criticized the portion of the Eleventh Circuit's decision in Cooper that reads, "[p]retext can be established [in a failure to hire case] through comparing qualifications only when 'the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face.'" While the Ash Court stated that this articulation is "imprecise" and "unhelpful" in determining pretext, it did not articulate any precise standard for lower courts to use in doing so. See generally Ash, 126 S.Ct. 1195. In declining to articulate a precise standard, the Supreme Court, however, noted that the Eleventh Circuit in the same Cooper decision, and other appellate courts, have articulated standards. Id. at 1197-98 (citing Cooper, 390 F.3d at 732; Raad, 323 F.3d at 1194 ("clearly superior" standard)); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc) (concluding the factfinder must infer pretext if "a reasonable employer would have found the plaintiff to be significantly better qualified for the job")). While this Court does not necessarily take Ash to be a sea change in discrimination law, the undersigned nevertheless notes the Supreme Court's discussion of these standards.

Cubit or Bill Foreman.  Bill Cubit, the first choice for the position in 2003, has substantial head high school coaching experience (3 years as head varsity football coach from 1986-1988 at Martin County High School - compiling a 30-5 record), and as a head and assistant collegiate football coach spanning from 1989 through the date of his interview in 2003.  (Doc. 18-7, Ex. "E"; Doc. 23-3, Dallas Dep. at pp. 37-38).  Throughout his career, Coach Cubit served as the quarterbacks coach from 1989-1990 at the University of Florida, running backs coach from 1990-1991 at Akron University, head coach at Widener University from 1992-1996, offensive coordinator from 1997-2000 at Western Michigan, offensive coordinator at the University of Missouri from 2000-2001, and offensive coordinator at Rutgers University since 2001. (Id.).

Bill Foreman, who accepted the FBHS head coaching position after Bill Cubit turned it down, had prior experience that the committee deemed sufficient for a head football coach.  Specifically, Coach Foreman had served as the head varsity football coach at Providence High School from 2000 through 2002, and was then serving as the head assistant and defensive coordinator at Sandalwood High School.  (Doc. 18-8, Ex. "F").  Coach Foreman had also served as the head football coach at Yulee Middle School from 1996 through 1998.  (Id.).  Further, committee member Tarris Dallas (African-American) testified that Bill Foreman had "overwhelmingly, in [his] opinion, the best interview of anybody [he] sat in on."  (Doc. 23-4, Dallas Dep. at p. 67).

Comparing the qualifications of these candidates, Bill Cubit had substantial coaching experience at both the high school and collegiate levels; therefore, plaintiff cannot make the requisite showing as to the decision to offer the position to Coach Cubit.  While plaintiff was arguably as qualified as Coach Foreman to serve as head football coach in 2003, the Court cannot conclude that plaintiff's qualifications were "clearly superior" to or "significantly better" than that of Coach Foreman, or, much less, that they were even superior.  See Raad, 323 F.3d at 1194; Aka, 156 F.3d at 1294.

### ii.   **Ken Roland's statement**

Plaintiff also asserts that Athletic Director Ken Roland's comment to Mike Sinor in 2002 that "they (African-Americans) are not going to play for you, blacks are lazy," is evidence of discrimination because Roland served on the 2003 hiring committee that ultimately selected Bill Cubit and Bill Foreman.  Defendant asserts that this statement is inadmissible hearsay from a third party non-decision maker, and, even if considered, is an isolated stray remark insufficient to establish discrimination.

Ken Roland made this statement before he was selected by Principal Arnold to serve on the 2003 hiring committee.[8]  Even assuming *arguendo* the statement is admissible, such a stray remark, though repugnant, is not direct evidence of

_____

[8]   It appears Ken Roland has not been deposed in the case, and has not otherwise been provided an opportunity to admit or deny making the statement. However, for summary judgment purposes, the Court assumes that Roland made the statement.

discrimination.  See Wheatley v. Baptist Hosp. of Miami, Inc., 16 F. Supp. 2d 1356,

1359-60 (S.D. Fla. 1998), aff'd, 172 F.3d 882 (11th Cir. 1999).  Racially derogatory

comments can be direct evidence if the comments were made: (1) by the decision

maker responsible for the alleged discriminatory act, (2) in the context of the

challenged decision, and (3) in temporal proximity to the employment decision.  See

Wheatley, 16 F. Supp. 2d at 1360; Trotter v. Board of Trustees, 91 F.3d 1449, 1453

(11th Cir. 1996) (abrogated on other grounds by Desert Palace, Inc. v. Costa, 539

U.S. 90 (2003)).[9]  Stray remarks, however, may "provide circumstantial evidence to

support an inference of discrimination."  Ross v. Rhodes Furniture, Inc., 146 F.3d

1286, 1291 (11th Cir. 1998).

Roland's statement has no evidentiary value to circumstantially establish

discriminatory animus in the decision to hire Coach Foreman over plaintiff.  First,

Principal Arnold was not required to convene any search committee to make her

decision, see Fla. Stat. § 1012.28(2), and, any decision of the search committee was

not binding on her, (Doc. 19-3, Arnold Dep. at pp. 45, 51-52).  Second, the statement

was made before the committee was empaneled and before the School Board even

_____

[9]    At very best Roland was a quasi decision maker in this case.  Even though he
was the Athletic Director when Bill Foreman was hired and he served on the hiring
committee, he acted merely in an advisory fashion.  Principal Arnold had discretion
in recommending a coach to Superintendent Ruis, and was in no way bound by any
recommendation of Roland.  In addition, the comment was not made in connection
with the decision to hire Coach Foreman over the plaintiff.

knew it would have an opening for the FBHS coaching position.[10]  Third, there is no evidence that Principal Arnold, Superintendent Ruis , or any School Board members, were ever made aware that the statement had been made, or that it played any part, whatsoever, in the decision making process.

### iii.    Changes in method of hiring

Plaintiff further asserts that defendant has systematically changed the manner in which it has hired a head football coach at FBHS.  Specifically, plaintiff asserts that on some occasions, the Principal has used a search committee, and, on other occasions, the Principal has opted not to.

This evidence is of limited value and amounts to little more than plaintiff's own suppositions as to defendant's discriminatory animus.  The applicable statute vests the Principal with the responsibility to make hiring recommendations to the Superintendent.  See Fla. Stat. § 1012.28(2).  It is silent on how this function must be carried out; thus, by implication, the Principal is vested with discretion in performing this statutory duty.  That three different Principals since 1988 have chosen to exercise this duty in various ways, without more, is not probative of discriminatory animus.  Plaintiff's unsupported assertions that any fluctuation in hiring process was carried out to discriminate against plaintiff are insufficient to survive summary judgment.

---

[10]  The statement was purportedly made in the spring of 2002.  Coach Bob Howard coached the FBHS football team the ensuing fall and resigned after the season.

### iv.   <u>Changes in qualifications</u>

Plaintiff posits that defendant has changed the necessary qualifications for the head football coach during the sixteen year span that plaintiff has applied for the position to exclude him from obtaining the job.   Plaintiff likewise fails to present sufficient evidence that any "changes" in the required qualifications for head football coach at FBHS were implemented to discriminate against him.   With respect to articulated qualifications for the position, the record only addresses the qualifications that Principal Arnold sought in 2003 and 2004.   There is no deposition testimony or declaration from either Dr. William Fryar or Dr. Michael Dean (the former FBHS Principals who, in addition to Principal Arnold, hired head coaches since 1988) to show what qualifications they considered in hiring head football coaches from 1988 through 1997.   That leaves the Court to analyze the required qualifications in 2003 and 2004.[11]

Principal Arnold testified that she sought the "best" candidate for the position to turn the FBHS program into a winning program and a coach that could provide some longevity in the position.   (Doc. 19-5, Arnold Dep. at p. 75).   The committee recommended Bill Cubit and Bill Foreman.   While it is true that Coach Foreman only coached for one year, Principal Arnold certainly was not in a position to forecast that at the time she made her decision; thus, any attempt by plaintiff to show that Coach

---

[11]   Plaintiff's argument concerning the "changing qualifications" as it relates to Coach Ed Brown is discussed in conjunction with the retaliation claim, which addresses the hiring of Coach Brown over plaintiff.

Foreman was obviously not capable of fulfilling the longevity "qualification" is nothing more than post hoc criticism.  There is no evidence to suggest that, at the time Principal Arnold made her decision, she had any inkling that Coach Foreman would stay for only one season.

### v.     The Association Contract

Finally, plaintiff argues that because Coach Howard resigned during the 2002-2003 school year (January 2003) and retained his teaching position, there was no "vacancy" as defined by the Association Contract, see Doc. 18-2, Ex. "A," Article X(A), meaning that the School Board was required to hire someone already teaching at FBHS, i.e. plaintiff, to serve in the supplemental position as head football coach.  The record reveals that Coach Foreman began as an "athletic volunteer" in the spring of 2003; this was until Ms. Owens-Williams' retirement became effective and Mr. Foreman could fill the ISS teaching position at the beginning of the 2003-2004 school year.  (Doc. 18-12, Ex. "J").  Because the School Board understood that Ms. Owens-Williams was retiring pursuant to DROP in July 2003, and was never informed to the contrary, it is certainly plausible that the School Board was free to consider and/or hire candidates outside of FBHS for that position because of its expectation that the ISS position would be open.  There is no evidentiary value to plaintiff's position that because FBHS considered candidates to fill the ISS and head football coach position that were outside of FBHS or the Nassau County School system, defendant discriminated against plaintiff based on his race.

In sum, plaintiff's proof concerning relative qualifications of applicants in 2003, the stray remark made by Ken Roland in 2002, the historical evidence submitted concerning the hiring decisions made since 1988, plaintiff's allegations that the hiring process and required qualifications for the position changed to preclude him from obtaining the position, and the allegation that the School Board breached the Association Contract when it hired Coach Foreman, are insufficient as a matter of law to show that plaintiff's reason for hiring Coach Foreman in 2003 (that he was the best candidate for the job after Bill Cubit), was pretext for a discriminatory motive.  Thus, summary judgment is due to be granted to defendant on Count I.

### 3.    Hiring of Ed Brown in 2004

In Count IV of the Amended Complaint, plaintiff contends that defendant discriminated based on race when it hired Ed Brown (another African-American) over him in 2004.  On this claim, plaintiff fails to make out a prima facie case of race discrimination because he fails to show that the School Board, in making its hiring decision in 2004, treated similarly situated individuals of other races more favorably. See Laosebikan v. Coca-Cola Co., 2006 WL 224167, *1 (11th Cir.) (noting in a failure to promote case that a prima facie case for discrimination includes a showing that individuals outside of a protected class were promoted) citing EEOC v. Joe's Stone Crabs, 296 F.3d 1265, 1273 (11th Cir. 2002); see also Holifield, 115 F.3d at 1562 (holding that a prima facie case for discrimination includes an employer treating a similarly situated employee outside the protected class more favorably).   The

individual hired, Ed Brown, is of the same race as plaintiff.  Thus, plaintiff has failed

to establish a prima facie case of discrimination on Count IV.  Summary judgment is

due to be granted to defendant on this count.

### B.    Disparate Impact Claim (Count II)

In Count II of the Amended Complaint, plaintiff asserts a claim titled

"Discriminatory Effect."  When asked about the nature of this claim at oral argument,

plaintiff stated that it was a "discriminatory (disparate) impact" claim.  The disparate

impact theory prohibits practices that while not discriminatory on their face, visit an

adverse, disproportionate impact upon individuals in a protected class.  Griggs v.

Duke Power Co., 401 U.S. 424, 431 (1971) ("[Title VII] proscribes not only overt

discrimination but also practices that are fair in form, but discriminatory in operation");

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1117 (11th Cir. 1993).  To establish a

disparate impact claim, plaintiff must show: (1) the existence of a statistically

significant disparity among members of different groups affected by employment

decisions; (2) the existence of a specific, facially neutral employment practice; and (3)

the existence of a causal nexus between the specific, facially neutral employment

practice and the statistically significant disparity.  42 U.S.C. § 2000e-2(k); Joe's Stone

Crab, 220 F.3d at 1274.  In other words, the plaintiff need not prove discriminatory

intent, but must identify specific facially neutral employment practices that are

allegedly responsible for statistical disparities.  Joe's Stone Crab, 220 F.3d at 1274.

Here, plaintiff asserts a disparate impact theory, yet sets forth no analysis as

to whether he has met the required prima facie case.  The gravamen of the claim, however, concerns the selection process (i.e. whether the three Principals at FBHS who have hired head football coaches since 1988 have empaneled selection committees or made the decision themselves without the use of a committee, and the alleged "changing" qualifications for the position over the years).

A close reading of Count II reveals that plaintiff alleges the selection process and the "changing" qualifications for the position have only adversely affected him, not African-Americans as an entire group.  However, the basis of a disparate impact claim is that a particular group, rather than an individual, has suffered discrimination because of a specific policy or practice.  Connecticut v. Teal, 457 U.S. 440, 459 (1982).  "There can be no disparate impact in the absence of disparate impact on a *group.*"  Id. (emphasis added); see also Cooper, 390 F.3d at 724 (noting disparate impact cases arise out of specific policies or practices that "have a disproportionate impact on an entire *class* of employees") (emphasis added), criticized on other grounds by Ash, 126 S.Ct. at 1197.  Thus, summary judgment is due to be granted to defendant on Count II of the Amended Complaint.

### C.    Retaliation Claim (Count III)

In Count III of the Amended Complaint, plaintiff contends that defendant hired Ed Brown in 2004, instead of him, in retaliation for plaintiff filing a charge of discrimination in August 2003 contesting the 2003 hiring of Bill Foreman.  Title VII makes it unlawful:

[F]or an employer to discriminate against any of his employees or applicants for employment, ... because he has opposed any practice made an unlawful employment practice by this subchapter [of Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII].

42 U.S.C. § 2000e-3(a).

In circumstantial evidence retaliation claims under Title VII, the McDonnell-Douglas burden shifting mechanism applies.  To establish a prima facie case of retaliation, the plaintiff must show: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between his protected activity and the adverse employment action.  Bass v. Board of Cty. Com'rs, Orange Cty., Fla., 256 F.3d 1095, 1117 (11th Cir. 2001).

If the plaintiff is able to assert a prima facie case of retaliation, the defendant must proffer a legitimate, non-discriminatory reason for the adverse employment action.  Holifield, 115 F.3d at 1566.  If the employer offers legitimate reasons for the employment action, the plaintiff must demonstrate that the proffered explanation is pretext for retaliation.  Id.

Here, it is undisputed that plaintiff engaged in protected activity when he filed his charge of discrimination in August 2003 contesting the School Board's decision to hire Bill Foreman.  The record further reveals that plaintiff sent a letter dated March 21, 2003 to the members of the Nassau County School Board voicing his displeasure with the selection of Bill Foreman as football coach in 2003.  (Doc. 19-7, Arnold Dep. Ex. "5").  These activities are protected under § 704(a) of Title VII.  See Holifield, 115

F.3d at 1566.

For the reasons previously discussed, plaintiff also suffered an adverse employment action when he was not hired for the head football coaching position in 2004.  Defendant, however, contends that plaintiff fails to show a causal relationship between his protected activity and the adverse employment action.    Namely, defendant cites case law stating that the temporal proximity between the protected activity and the adverse employment action must be "very close."  See Clark County Sch. Dist v. Breeden, 532 U.S. 268, 273 (2001).  Like the Supreme Court in Breeden, defendant cites case law holding that temporal proximity of even three or four months is insufficient to establish the required causal link.  See Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three month period between plaintiff's termination and claim for overtime pay under the Fair Labor Standards Act insufficient to establish the causal link factor of the prima facie case of retaliation); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (no causal link established when four months elapsed between filing of formal discrimination complaint and issuance of a disciplinary letter).

While the Court is cognizant of those cases that analyze causation based on temporal proximity of the protected activity and the adverse employment action, it views this situation as somewhat unique.  Even though the 2004 adverse employment action occurred approximately 9 and 15 months after the protected activities, the hiring of a football coach is not an event that necessarily can happen on any given

day, as opposed to the firing of an employee or the issuance of a disciplinary letter. Thus, the Court assumes *arguendo* that plaintiff meets the required prima facie case of retaliation.

Defendant's proffered legitimate non-discriminatory reasons for hiring Ed Brown, as opposed to the plaintiff, are: (1) because Coach Foreman resigned during spring practice, the selection of a coach had to be done expeditiously; therefore, the committee was not re-empaneled; (2) because the committee had vetted ten candidates only a year prior who were still presumably interested in the position, there was no need to re-institute the committee to assist in a hiring decision; and (3) Principal Arnold knew there was a position open in the FBHS math department that Coach Brown (a math teacher at FBMS) could fill in order to assume the supplemental position as head football coach. (Doc. 19-6, Arnold Dep. at pp. 108, 110-112). Further, according to committee member Larry Coleman, the advisory committee ranked Ed Brown higher than plaintiff during the 2003 selection process. (Doc. 22-3, Coleman Dep. at p. 32). Defendant meets its minimal burden of proffering a nondiscriminatory reason for failing to hire plaintiff. Thus, plaintiff must now show those reasons are pretext for a retaliatory motive.

In his response, plaintiff does not specifically address whether the proffered non-discriminatory reasons for the May 2004 hiring of Ed Brown are pretext for discrimination. Instead, plaintiff appears to rely on the same pretext arguments for the discrimination claims addressed toward the 2003 hiring of Coach Foreman.

### 1.    Relative qualifications

Coach Brown served as the head coach at FBMS and enjoyed great success during his eleven seasons there (combined 51-20-1 record).  (Doc. 18-14, Ex. "L").  Plaintiff also served as a head middle school coach at Yulee Middle School for three seasons and immediately took the team from a winless season to two seasons with a winning record (including a five win, one loss mark in plaintiff's final season).  (Doc. 20-3, Pl. 9/8/05 Dep. at pp. 25-26).  Further, plaintiff served as an assistant coach under four different head coaches at FBHS for eleven years.  While plaintiff has more varsity experience as an assistant coach than Coach Brown, Coach Brown has served in a middle school head coaching role for over a decade.   In assessing qualifications, it cannot be said that plaintiff was more qualified than Coach Brown; thus, plaintiff fails to carry his burden of showing that this proffered non-discriminatory reason is pretext for retaliatory motive.

### 2.    Changes in method of hiring and qualifications

For the previously articulated reasons, plaintiff's position that defendant changed the method of hiring and necessary qualifications to preclude him from obtaining the head football coaching job is insufficient to create a factual dispute.  There were three different Principals making the seven different hiring decisions, and there is no record evidence that any of them deviated from the requirements of the law in hiring a football coach.  Title VII does not require that a high school football coach be hired in the exact same fashion over a sixteen year period.  What it does

require is that defendant not engage in standardless and discriminatory procedures in making hiring decisions.  See Carter, 132 F.3d at 644.  There was no such occurrence here.  Because the three Principals chose to use search committees on some occasions, and not others, does not equate to standardless hiring.  The only evidence in the record as to why a committee was used on one occasion and not another were the 2003 and 2004 hirings.

In 2003, there was ample time to form a committee, vet candidates and come to a consensus on who should be the head coach.  In stark contrast, 2004 required expediency, and the committee had convened only a year prior and analyzed a lengthy slate of applicants who were still presumably interested in the job.  It is unrebutted that Principal Arnold considered these factors in hiring Ed Brown in 2004.

Further, as previously discussed, the record only addresses the qualifications that Principal Arnold sought in 2003 and 2004, not those that the prior principals required.  Principal Arnold sought a qualified head coach who was within the pool considered in 2003 and who could start immediately.  While both plaintiff and Ed Brown fit that criteria, defendant's hiring of Ed Brown, without more, is insufficient evidence of retaliatory animus.  Plaintiff has adduced no evidence that the hiring of Ed Brown, an African-American who was at least as qualified as plaintiff, was pretext for a retaliatory motive.

### 3.   The Association Contract

Plaintiff also posits that defendant again violated the Association Contract when

-35-

it offered the supplemental head coaching position to Coach Brown in May 2004 because, at that point in time, there was no "vacancy" in the math department as defined by the Association Contract.[12]   Even viewing this in the light most favorable to plaintiff, it is of little import.  It is unrebutted that Principal Arnold knew she would have a math teacher position available the following school year, and that Coach Brown was being hired to fill that position.  (Doc. 19-6, Arnold Dep. at pp. 108, 110-112).  In addition, on May 27, 2004, Superintendent Ruis issued the "Superintendent's Recommendation Regarding The Assignment of Personnel" and noted therein that he recommended Coach Brown be "reassigned and involuntarily transferred" into a math position at FBHS.  (Doc. 19-8, Arnold Dep. at Ex. "13").  That same document notes two FBHS teachers (Kathleen L. Warner and Michael D. Landtroop) had resigned effective May 25, 2004.  (Id.).  The record is unclear as to whether either Ms. Warner or Mr. Landtroop taught math at FBHS.  Even assuming *arguendo* there was some technical violation of the Association Contract, the Court imputes no evidentiary value to any such violation being the manifestation of retaliatory animus in hiring Coach Brown over plaintiff.

---

[12]   Plaintiff contends that because there was not a true vacancy at the moment Principal Arnold recommended Ed Brown for the position, pursuant to Article X(A), a "voluntary transfer" pursuant to Article XI of the Association Contract was not permissible.  (Doc. 18-2, Ex. "A," Article X & XI).  Thus, according to plaintiff, the only option under the Association Contract for recommending that Ed Brown be hired as a math teach and head football coach was under an "involuntary transfer."  (Id. at Article XII).  Plaintiff asserts that because there was no "reduction in force" or "extenuating circumstance," there was no authorization for an involuntary transfer of Ed Brown into a math teaching position at FBHS.

In sum, the crux of plaintiff's argument is that it would have either been discriminatory to hire a white coach or retaliatory to hire any African-American coach other than plaintiff in 2004.  This creates an anomalous situation where if defendant hires an African-American coach such as Coach Brown, it is retaliatory, and if defendant hires another white coach, then a case for discrimination lies.  However, without factual support of either discriminatory or retaliatory motive, plaintiff's claim is insufficient to survive summary judgment.  See Zaben, 129 F.3d at 1457 (requiring "significantly probative evidence" showing the proffered evidence is pretext for an illegal motive).  Thus, defendant is entitled to summary judgment on the retaliation claim (Count IV).

## IV. CONCLUSION

For the foregoing reasons, summary judgment is appropriate for defendant on all counts (Counts I through IV) in the Amended Complaint.  Accordingly, it is hereby **ORDERED**:

Defendant Nassau County School Board's Dispositive Motion For Summary Judgment (Doc. 18) is **GRANTED**.  The Clerk will enter judgment in favor of defendant and against plaintiff and close the file.

-37-

**DONE AND ORDERED** at Jacksonville, Florida this <u>8th</u> day of May, 2006.

TIMOTHY J. CORRIGAN
United States District Judge

t.
Copies to: counsel of record